**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JG, et al.,<br><br>                Plaintiffs,<br><br>vs.<br><br>Creighton Elementary School District,<br><br>                Defendant. | No. CV-21-00535-PHX-SPL<br><br>**ORDER** |

At issue is an administrative law judge's ("ALJ") decision on Plaintiffs' Due Process Complaint under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. (Doc. 1-2). While the ALJ partially held in Plaintiffs' favor—finding that Defendant Creighton Elementary School District (hereinafter "Defendant" or "District") denied Plaintiffs' daughter a free and appropriate public education—the ALJ denied Plaintiffs' request for reimbursement for tuition and related expenses incurred by Plaintiffs when they placed their daughter at a residential treatment center. (Doc. 1-2 at 40). Plaintiffs filed a Complaint with this Court on behalf of themselves (hereinafter "Parents") and their minor daughter, G.G. (hereinafter "Student"), seeking judicial review of the ALJ's denial of reimbursement. (Doc. 1). The Court now considers Plaintiffs' Opening Brief (Doc. 17), Defendant's Response/Answering Brief (Doc. 18), and Plaintiffs' Reply Brief (Doc. 19).[1] For the reasons that follow, this Court affirms the ALJ's decision.

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R.

## I.     BACKGROUND

Student had never attended a District public school; she had been enrolled in parochial school until May 2019, the end of her seventh-grade year. (Doc. 1-2 at 6). At that time, Student experienced a behavioral health crisis and was hospitalized overnight. (*Id.*). She was then admitted to Quail Run Behavioral Health where she remained for eight days. (*Id.*). Student was diagnosed with Major Depressive Disorder, Generalized Anxiety Disorder, and Attention Deficit Hyperactivity Disorder (ADHD), combined type. (*Id.*). On June 10, 2019, about one month after she was discharged to home, Student was placed at Pacific Quest, an integrative behavioral health program. (*Id.* at 7). On August 8, 2019, Student's mother sent an email to District, inquiring about special education services and requesting an evaluation for Student to "understand what the school could offer." (*Id.* at 9). On August 10, 2019, Student was discharged from Pacific Quest. (*Id.* at 8). Two days later, she was placed at Moonridge Academy ("Moonridge"), a residential treatment center in Utah. (*Id.* at 9). From August to October 2019, Student's mother continued the IEP evaluation process with District. (*Id.* at 9–19). On October 22, 2019, District determined Student's IDEA eligibility "as, primary, Emotional Disability, and secondary, Other Health Impaired." (*Id.* at 19). Despite finding Student eligible for an IEP, District failed to finalize and offer an IEP until May 15, 2020. (Doc. 1 at 3). In addition to the IEP, District also offered Student extended school year ("ESY") services from June 1, 2020 through July 17, 2020. (Doc. 1-2 at 26). Meanwhile, Student remained at Moonridge for the entirety of the 2019–20 school year; she enrolled with District on May 27, 2020. (*Id.* at 26–27).

Two months prior—on March 17, 2020—Plaintiffs filed a Due Process Complaint with the Arizona Department of Education ("ADE"). (Doc. 1 at 3). Plaintiffs alleged that District denied Student a free and appropriate public education ("FAPE")—in violation of the IDEA—when it failed to develop an individualized education program ("IEP") within thirty days after finding Student eligible for an IEP on October 22, 2019. (*Id.*). Parents

---

Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

sought reimbursement for their placement of Student at Moonridge. (*Id.*). The ADE "referred the Complaint to the Office of Administrative Hearings for a hearing before an assigned [ALJ], Kay Abramsohn." (*Id.* at 4). The ALJ held a hearing on the Complaint over a three-day period—from September 8, 2020 through September 10, 2020. (*Id.*). On February 22, 2021, the ALJ issued her decision, finding Student was denied a FAPE but denying reimbursement to Plaintiffs. (Doc. 1-2 at 40). The reimbursement denial was based on the ALJ's finding that Student was placed at Moonridge for "medical, social, and emotional concerns rather than educational concerns"; thus, District was not responsible for financing Student's placement there. (*Id.*).

On March 26, 2021, Plaintiffs filed a Complaint in this Court requesting a reversal of the ALJ's decision as to reimbursement. (Doc. 1). In their Opening Brief, Plaintiffs allege the ALJ erred in concluding that Parents "placed [Student] at Moonridge for medical, social, and emotional needs that were separate and apart from [Student's] educational needs." (Doc. 17 at 1). Instead, Plaintiffs contend that Student's needs were all intertwined, that Student derived an educational benefit from her placement at Moonridge, and that District was therefore responsible for reimbursement. (*Id.* at 2). Plaintiffs request that this Court find that reimbursement was appropriate and enter a judgment in the amount of $84,199.00—the combined total of tuition and activity fees ($76,900.00) and related expenses ($7,299.00). (Doc. 1 at 7). Plaintiffs additionally seek attorneys' fees and costs incurred in the administrative proceedings and in pursuing this appeal. (*Id.*).

In this appeal, Plaintiffs allege there are various errors in the ALJ's decision such that the decision was "fatally flawed" and not entitled to deference. (Doc. 17 at 5). Specifically, Plaintiffs argue the ALJ's decision "ignored key documentary and testimonial evidence, was inherently inconsistent, misinterpreted legal authority, and failed to note relevant authority." (Doc. 17 at 5).

///

///

///

## II. LEGAL STANDARDS

### A. The IDEA

The IDEA requires that state educational agencies receiving federal funds provide special education services for children with qualifying disabilities. *See* 20 U.S.C. § 1400(d)(1)(A).[2] The IDEA "conditions receipt of funding on compliance with certain statutory requirements, including that states provide every eligible child a free and appropriate public education ("FAPE") by means of an [individual education program ("IEP")]." *McCarthy v. Scottsdale Unified Sch. Dist. No. 48*, 409 F. Supp. 3d 789, 801 (D. Ariz. 2019) (citations omitted). A FAPE is defined as special education and related services that:

> (1) have been provided at public expense, under public supervision and direction, and without charge;
>
> (2) meet the standards of the State educational agency;
>
> (3) include an appropriate pre-school, elementary school, or secondary school education in the State involved; and
>
> (4) are provided in conformity with the [IEP] required under sections 1414(d) of this title.

§ 1401(9). In other words, "[a] state satisfies the requirement to provide a FAPE by providing instruction and services, at public expense, that meet the State's educational standards and comport with the child's IEP." *Dreher v. Amphitheater Unified Sch. Dist.*, 797 F.Supp. 753, 757–58 (D. Ariz. 1992) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 203 (1982)). The IDEA requires that public school districts provide qualifying students a "basic floor of opportunity"; it does not require that the school maximize each child's potential. *Rowley*, 458 U.S. at 198–204.

///

---

[2] At the October 22, 2019 multidisciplinary evaluation team ("MET") meeting, Student was found to have qualifying disabilities—Emotional Disability (primary) and Other Health Impaired (secondary)—and was therefore found eligible for an IEP. (Docs. 1-2 at 34, 17 at 6, 18 at 6). The parties do not dispute Student's disabilities nor her eligibility for an IEP.

4

Once it is determined that a child is eligible for special education and related services, a public school district is required to construct an IEP Team comprised of various school personnel and the student's parents. § 1414(d)(1)(B). Together, the IEP Team develops an IEP, which informs how the child will be educated in light of his particular needs that result from his disability. *See* § 1414. The school district must develop an IEP within thirty days of the eligibility determination and implement it as soon as possible. 34 C.F.R. § 300.323(c). A student's IEP must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207.

### B. Standard of Review

Under IDEA, an aggrieved party may bring a civil action in federal district court after receiving the final decision of an ALJ. *See* 20 U.S.C. § 1415(i)(2)(A). The party challenging the ruling bears the burden of proving the ALJ's decision was not met by a preponderance of the evidence. *Clyde K. v. Puyallup Sch. Dist.*, 35 F.3d 1396, 1399 (9th Cir. 1994), *superseded on other grounds as recognized in L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009). The IDEA provides that the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(C). "Thus, judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993) (citation omitted).

The Court reviews *de novo* a state hearing officer's findings and conclusions. *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1182 (9th Cir. 2009) (citing *Seattle Sch. Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996)). "At the same time, section 1415(i)(2)(C)'s mandate that the reviewing court receive the records of the [state] administrative proceedings carries with it the implied requirement that due weight shall be given to these proceedings." *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004,

1008 (9th Cir. 2009) (internal quotation marks omitted) (citing *Rowley*, 458 U.S. at 206 and *Seattle Sch. Dist.*, 82 F.3d at 1499). District courts "lack[] specialized knowledge and experience in the realm of educational policy." *Dreher*, 797 F.Supp. at 757. Thus, courts must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

It is a matter of district court discretion to decide the degree of deference to give the ALJ's determination. *Ojai*, 4 F.3d at 1472. "[T]he fact-intensive nature of a special education eligibility determination coupled with considerations of judicial economy render a more deferential approach appropriate." *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 n.4 (9th Cir. 2007). The Court gives particular deference to "thorough and careful" administrative findings. *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (internal quotation marks and citation omitted).

### III. ANALYSIS

#### A. Deference

The ALJ Decision is a forty-page order setting forth the witnesses, the evidence, and the issues at the hearing and includes a detailed, twenty-three-page findings of fact. (Doc. 1-2). While Plaintiffs argue that the ALJ ignored key evidence, the ALJ states that she considered the entire record—including each page of every admitted Exhibit and the testimony of every witness—even if not specifically addressed in the Decision. (Doc. 1-2 at 5, n.11). This Court finds the Decision to be thorough and careful in its findings. This is particularly true as it relates to the specific issue presented now before this Court—whether Student's placement at Moonridge was for educational purposes rather than a response to social, medical, or emotional problems. In determining the latter to be the purpose of Student's placement, the ALJ considered Student's social, behavioral, and emotional problems, as well as the reports and testimony of those who worked with Student regularly during the relevant time periods. The ALJ considered the circumstances of Student's placement at Moonridge. The ALJ considered all aspects of Moonridge Academy, including its therapeutic and behavioral focus as well as its academic programs. The ALJ

considered all relevant communications between Parents, the District, and Moonridge concerning Student, including emails, conversations, and transcripts of several meetings over the course of many months.

Given that the administrative record included hundreds of pages of extensive documentary evidence, it was impossible for the ALJ to explicitly include all testimony of every witness or excerpts from every report related to Student's placement. That said, the fact that the ALJ failed to explicitly include certain details of the record does not convince this Court that the ALJ ignored the evidence altogether. That the Plaintiffs disagree with the ALJ's ultimate conclusions regarding such evidence is not a reason for this Court to accord the Decision less deference. Because the Court finds the ALJ was thorough and careful in her findings, the Court concludes they are entitled to significant weight. *See Ojai*, 4 F.3d at 1474–76 (finding that hearing officer's decision was entitled "substantial weight" after reviewing the record of the administrative proceedings).

### B. Reimbursement

The IDEA's grant of equitable authority empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985) (recognizing the availability of reimbursement as a remedy for a school district's failure to provide a FAPE). In *Florence County School District Four v. Carter*, the United States Supreme Court explained the policy behind such reimbursement:

> Congress intended that IDEA's promise of a [FAPE] for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents. In cases where cooperation fails, however, parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. . . . For parents willing and able to make the latter choice, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials. . . . Because such a result would be contrary to IDEA's guarantee of a

7

> [FAPE], we held that Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.

510 U.S. 7, 12 (1993) (citations omitted) (internal quotations omitted). *Carter* went on to hold that reimbursement may be appropriate even when a child is placed in a private school that has not been approved by the State. *Id.* at 13–15. *Carter* also provided a two-part test for reimbursement: a parent or guardian is "entitled to reimbursement *only* if a federal court concludes both [1] that the public placement violated IDEA and [2] that the private school placement was proper under the Act." *Id.* at 15. Even if both criteria are met, however, full reimbursement is not automatically appropriate. Instead, the district court "must exercise its 'broad discretion' and weigh 'equitable considerations' to determine whether, and how much, reimbursement is appropriate." *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) (citing *Carter*, 510 U.S. at 15–16). For example, courts can consider the cost of the private education, the notice provided by the parents to the school district of their intent to enroll their child in private school, and the school district's opportunities for evaluating the child. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009) (noting the notice provided by parents and the school district's opportunities for evaluating child as factors for courts to consider); *Carter*, 510 U.S. at 16 (noting that total reimbursement is not appropriate if costs of the private education are unreasonable).

In *Forest Grove School District v. T.A.*, the Supreme Court reaffirmed its holdings in *Burlington* and *Carter*, and further held that reimbursement is authorized "when a school district fails to provide a FAPE and the private-school placement is appropriate, *regardless* of whether the child previously received special education or related services through the public school." 557 U.S. at 247 (emphasis added). The Court explained that "[i]t would be particularly strange for the Act to provide a remedy, as all agree it does, when a school district offers a child inadequate special-education services but to leave parents without relief in the more egregious situation in which the school district unreasonably denies a child access to such services altogether." *Id.* at 245.

Here, Defendant failed to create an IEP for Student within thirty days after it determined that she was eligible on October 22, 2019. (Doc. 1 at 2–3). Instead, Defendant did not offer Student an IEP until May 15, 2020. (*Id.* at 3). This violated 34 C.F.R. § 300.323(c), which—as noted above—requires a school district to develop an IEP within thirty days of determining that a student is eligible. Like the plaintiff in *Forest Grove*, Student had not previously received special education or related services through Defendant. In fact, Student was not even known to Defendant prior to August 2019, as Student had previously attended only parochial schools and had never been enrolled with Defendant. (Doc. 1-2 at 34). The ALJ found that Defendant's inaction "was a procedural violation constituting a substantive failure to provide a FAPE." (*Id.* at 36). The ALJ explained that Defendant's "delay in development of an IEP significantly impeded Parents' decision-making as to the provision of a FAPE for Student" because Parents were left without an IEP to consider against alternative possibilities. (*Id.*). The parties do not dispute the ALJ's finding that Defendant failed to provide Student a FAPE. Therefore, this Court will not disturb that finding; the first criterion of the *Carter* reimbursement test—that the public placement violated the IDEA—has been met.

Whether the ALJ was correct in denying reimbursement to Plaintiffs therefore turns on the latter half of the two-part *Carter* test—that is, whether Student's placement at the residential treatment center, Moonridge, was "appropriate" or "proper" under the IDEA. Ninth Circuit law holds that a residential placement is "proper" if it is (1) necessary for the student to receive benefit from her education and (2) for educational purposes, rather than "a response to medical, social, or emotional problems . . . quite apart from the learning process." *Edmonds Sch. Dist. v. A. T.*, 780 Fed.Appx. 491, 494–95 (9th Cir. 2019) (citing *Seattle Sch. Dist.*, 82 F.3d at 1500 and *R.J.*, 588 F.3d at 1010); *see also Clovis Unified Sch. Dist. v. Cal. Off. of Admin. Hearings*, 903 F.2d 635, 643 (9th Cir. 1990) ("[W]e reject the line of reasoning . . . that where 'medical, social, or emotional problems that require hospitalization create or are intertwined with the educational problem, the states remain responsible' for the entire cost of the placement. Rather, our analysis must focus on

whether [the child]'s placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social or emotional problems that is necessary quite apart from the learning process."). To qualify for reimbursement, "parents need not show that a private placement furnishes every special service necessary to maximize their child's potential." *Garden Grove*, 635 F.3d at 1159 (citing *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir. 2006)). Instead, they "need only demonstrate that the placement provides educational instruction specifically designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Id.*

Here, the ALJ found that Student's placement at Moonridge "was necessitated by medical, social, and emotional concerns rather than educational concerns." (Doc. 1-2 at 40). Therefore, Moonridge was not a "proper" placement under the IDEA and the ALJ denied reimbursement to Parents. (*Id.*). This Court agrees with the ALJ and finds no reason to overturn its findings. First, the circumstances of Student's admission to Moonridge indicate that Parents were—above all else—concerned with Student's social, emotional, and behavioral issues. Student experienced a behavioral health crisis in May 2019 in which she placed both herself and her family in danger. (*Id.* at 6). She was hospitalized as a result, and subsequently spent time at a behavioral health center and later in a behavioral health program for youth. (*Id.* at 6–7). During this time, she was diagnosed with various psychological disorders. (*Id.*). While Student's academics were affected—she was unable to complete her seventh-grade coursework and Parents hired an Educational Consultant to assist them in finding the right placement for Student—the primary focus during this time was finding a residential treatment center that would allow Student master the skills she lacked and that were essential to her success in life, not just in school. (*Id.* at 6–9).

The ALJ found similarly and pointed to supporting evidence in the record. For example, the ALJ noted that—at the time of her Moonridge placement—Student "had never been identified as a child with a disability eligible for special education and related services." (*Id.* at 39). Additionally, "Student was not placed at Moonridge based on a

disagreement with District's offer of a FAPE or a disagreement with services being provided by any public school." (*Id.*). Instead, the ALJ found that

> Based on the evidence of record, Student's admittance to Moonridge on August 12, 2019, was a unilateral private placement by Parents *solely for behavioral health (social, emotional) concerns and purposes* so that Student could learn and successfully master skills, which she did not have at that time, and be prepared and able to participate in life in a healthy and productive way, not just at school.

(*Id.* at 28 (emphasis added)). While it was surely important to Parents that Student be placed somewhere that included an academic component in its services—to prevent Student from falling behind in school, at the least—Student's mother herself stated that the purpose of the placement was more than just educational. When asked, Student's mother stated that Moonridge was chosen because it "had to do with her going somewhere where she could be educated while simultaneously getting the work that she need[ed] to build the skills. . . . [S]he needed skills for everything." (*Id.* at 8).

It wasn't just the circumstances of Student's placement at Moonridge that showed her placement there was for her social, emotional, and behavioral needs. The ALJ also considered the nature of the facilities and services offered at Moonridge. Moonridge provided "the same academic rigor that any student might receive in a public school" and Student "academically received what was otherwise a typical academic education." (*Id.* at 39). While at Moonridge, Student did not have any individualized education program or plan. (*Id.*). Moreover, Student did not receive any sort of modified academic curriculum or modified instruction.[3] (*Id.*). What Moonridge did offer was extensive therapeutic treatment

---

[3] Plaintiffs argue that the ALJ took an "inconsistent position" by first acknowledging that Student did not need specially designed academic instruction and subsequently being critical of Moonridge for failing to provide any sort of modified academic curriculum or instruction. (Doc. 17 at 24).

This argument misses the ALJ's point. The ALJ's rejection of reimbursement is based *solely* on the non-educational purposes for which Student was placed at Moonridge. Thus, in noting that Moonridge did not provide Student any sort of modified curriculum or instruction, the ALJ was not being critical but instead pointing to evidence that shed light on the purpose behind Student's placement there. If Moonridge offered dramatic modifications to the academic curriculum or instruction, it stands to reason that a parent

1 designed to address Student's social, emotional, and behavioral needs. Student's Master
2 Treatment Plan ("MTP") listed Student's symptoms and problems—depression, anxiety,
3 suicidal and homicidal ideations, difficulty talking about issues and getting along with
4 others, development trauma, family conflict, and emotional literacy, among others—and
5 set forth several long-term goals for Student. (*Id.* at 10–11). While the goals make some
6 mention of school and education-related aspirations, their primary focus is on helping
7 Student to grow as a person and learn how to cope with her mental health issues. (*Id.* at
8 11). All told, as the ALJ stated in one of her findings of fact, Moonridge "was a residential
9 behavioral treatment center that offers comprehensive behavioral treatment in one location
10 to teenage girls with serious emotional or behavioral issues which often need attention from
11 many different professionals, such as child development specialists and psychiatrists who
12 specialize in teenage behavioral problems." (*Id.* at 27). While Moonridge certainly had
13 academic components, its overall services support the ALJ's finding that Student was
14 placed there for social, emotional, and behavioral reasons, not for educational ones.

15 Finally, the ALJ also noted how the Utah-based Moonridge was generally viewed
16 and categorized. Moonridge "was not known to be categorized by the State of Utah as a
17 private elementary school or a private secondary school" and "was not a Utah-approved
18 special education placement." (*Id.* at 28, 39). While not dispositive, the ALJ found this to
19 further support the conclusion that Parents placed Student at Moonridge for purposes aside
20 from education.[4] This Court agrees. Had Moonridge been more commonly known or

---

who places their child there would be doing so for educational reasons. Instead, the absence of modifications—the fact that Moonridge offers "a typical academic education" that "any student might receive in a public school"—implies just the opposite. A parent choosing this latter type of placement for their child would more likely be doing so for reasons other than academics.

[4] Plaintiffs cite to *Carter* in arguing that it was "irrelevant that Moonridge was not, as the ALJ pointed out, a Utah-approved special education placement." (Doc. 17 at 22–23). Indeed, *Carter* held that a private school may be "appropriate" for reimbursement purposes even if it fails to meet state standards or the statutory definition of FAPE. *Carter*, 510 U.S. at 13–15. Thus, under *Carter*, the fact that Moonridge failed to meet certain state standards has no impact on whether Moonridge was a "proper" placement. However, the ALJ did not

categorized as an educational facility, it would be more likely that a parent would place their child there for educational reasons. And given that Moonridge was not so categorized, it is presumably less likely that a parent would choose Moonridge for educational reasons.

Plaintiffs make two primary arguments as to why the ALJ was incorrect in finding that Moonridge was not "appropriate" or "proper" for purposes of reimbursement. First, Plaintiffs argue that the ALJ erred in determining that Student's placement at Moonridge was not for educational purposes. (Doc. 17 at 13). Plaintiffs assert that Student's social, emotional, and behavioral needs were "so intertwined" with her educational needs that they "could not be segregated." (*Id.*). In other words, Plaintiffs' argument is that the Moonridge placement—to address Student's social, emotional, and behavioral problems—was effectively a placement for educational purposes as well and was thus a "proper" placement entitling Plaintiffs to reimbursement. (*Id.*). Plaintiffs assert the ALJ ignored substantial portions of the record, including the October 2019 MET Report, the October 2019 PWN, the May 2020 IEP formulated by Defendant, and the testimony of Moonridge therapist Ashely Perez and academic director Susan Mackert. (*Id.* at 14–17). According to Plaintiffs, this evidence demonstrates how Student's social, emotional, and behavioral issues— including but not limited to her difficulties in regulating emotions, lack of effective coping skills, low self-esteem, anxiety, depression, developmental trauma, disruptive and impulsive behavior, feelings of being overwhelmed and hopeless, struggles with peer relationships, and executive functioning deficits—are intertwined with and have a significant impact on Student's academic success and educational needs. (*Id.*).

The Court does not deny that Student's social, emotional, and behavioral disabilities likely had a negative impact her academic success. Indeed, as Plaintiffs point out, Student's

---

deny reimbursement because Moonridge failed to meet certain state standards. The ALJ denied reimbursement because Student was placed at Moonridge for non-educational purposes. (Doc. 1-2 at 40). The fact that Moonridge was "not known to be categorized by the State of Utah as a private elementary school or a private secondary school" and that it was "not a Utah-approved special education placement" served as evidence that a child placed there would not be placed there for educational purposes. (*Id.* at 39).

13

IEP was not built around any specially designed academic instruction, but was instead aimed at addressing Student's social, emotional, and behavioral issues to better Student's performance in the classroom. (Doc. 17 at 20–21). However, to say that Student was admitted to Moonridge *for educational purposes* and that the District should therefore be responsible for paying for Student's placement there stretches the bounds of IDEA reimbursement too far. As the Ninth Circuit explained in *Clovis*, "[i]f a child requires . . . ear surgery to improve his hearing, he may learn better after a successful operation and therefore in some respects his surgery is 'supportive' of his education, but the school district is certainly not responsible for his treatment." *Clovis*, 903 F.2d at 643. Here, Student was placed at Moonridge over concerns related to her social, emotional, and behavioral issues. Addressing those issues surely benefitted Student in the classroom, just as ear surgery would presumably benefit the learning ability of a child who was previously hearing disabled. But *the purpose* of addressing Student's social, emotional, and behavioral issues—much like the purpose of ear surgery to improve a child's hearing—was to benefit Student in *all* aspects of Student's life, not just in the classroom. And just as the resulting educational benefits would not automatically put a school district on the hook for financing a child's ear surgery, the educational benefits of addressing Student's social, emotional, and behavioral issues alone fail to justify the District's reimbursement of Student's placement at Moonridge.

To be sure, this is a close and difficult case. Plaintiffs have shown evidence indicating that Student's social, emotional, and behavioral issues were closely related to Student's educational needs. However, the ALJ had the very same evidence before her and nevertheless concluded that Plaintiffs "have not demonstrated that Student's medical (i.e., behavioral), social, or emotional problems were so inextricably interwoven that they could not be separated from her educational needs." (Doc. 1-2 at 39–40). To the extent Plaintiffs argue that the ALJ ignored evidence, this Court is not persuaded. The ALJ specifically stated that all evidence in the record was reviewed and considered, even if it was not explicitly mentioned in the Decision. (*Id.* at 5, n.11). This Court finds no reason to doubt

the ALJ. The ALJ's Decision is thorough, sound, and well-reasoned. *See J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010) (quoting *Cnty. of San Diego v. Cal. Special Educ. Hearing Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996)) ("This Court gives deference to an ALJ's decision 'when it evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented.'"). Plaintiffs' argument fails to persuade the Court, by a preponderance of the evidence, that the ALJ's decision was incorrect. *See Clyde K.*, 35 F.3d at 1399 (placing the burden of proof on the party challenging the administrative ruling). This Court affirms the ALJ's Decision to the extent it found that Student was placed at Moonridge for behavioral treatment reasons and purposes and not for educational reasons and purposes.

Plaintiffs make an alternative argument as to why Student's private placement at Moonridge was "appropriate" or "proper" for reimbursement purposes. According to Plaintiffs, *even if* this Court affirms the ALJ's finding that placement was initially for social, emotional, and behavioral needs "separate and apart" from Student's educational needs, this Court should still find that the ALJ ignored evidence that Moonridge was otherwise appropriate because it "provided specially designed instruction to meet [Student]'s needs and from which she gained an educational benefit." (Doc. 17 at 22). In making this argument, Plaintiffs cite to *Garden Grove*. In that case, the Ninth Circuit adopted the following Second Circuit standard:

> To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. *They need only demonstrate that the placement provides educational instruction specifically designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.*

*Garden Grove*, 635 F.3d at 1159 (emphasis added) (quoting *Frank G.*, 459 F.3d at 365). Plaintiffs assert that Student's placement at Moonridge meets this standard and was therefore "appropriate," entitling them to reimbursement. (Doc. 17 at 22–23).

The Court finds that Plaintiffs' argument misconstrues the *Garden Grove* holding. In *Garden Grove*, the defendant school district argued that because the private placement

failed to meet *all* the student's educational needs—for example, it failed to provide instruction in arithmetic—it was not "proper" within the meaning of the IDEA. *Garden Grove*, 635 F.3d at 1159. The Ninth Circuit rejected this argument and in doing so adopted the Second Circuit standard, holding that private placements need only provide educational instruction "specifically designed to meet the unique needs" of the student, along with "such services as are necessary to permit the child to benefit from instruction." *Id.* As it applies here, *Garden Grove* stands only for the proposition that a private placement need not provide for every educational need of the student; it does not, however, state the complete test for what constitutes an "appropriate" or "proper" private placement for purposes of determining reimbursement.

As noted above, Ninth Circuit caselaw is clear that a private residential placement is only "appropriate" if it meets the two-prong test—that is, if the placement is *necessary* for the student to receive a benefit from her education and if the *purpose* of the placement is for educational reasons. *Edmonds*, 780 Fed.Appx. at 494–95 (citing *Seattle Sch. Dist*, 82 F.3d at 1500 and *R.J.*, 588 F.3d at 1010). Having already affirmed the ALJ's holding that the purpose of Student's placement at Moonridge was for non-educational reasons, the issue of whether the placement was "appropriate" or "proper" is settled. Plaintiffs' alternative argument does not change this fact. Even if Plaintiffs are correct—that is, that Moonridge provided specially designed instruction to meet Student's needs and from which she gained an educational benefit—Student's placement at Moonridge still fails to meet the "purpose" prong of the test. Moonridge may very well have provided instruction to meet Student's needs, and that instruction may very well have given Student an educational benefit, but that does not change the fact that she was placed at Moonridge for non-educational reasons.

The ALJ's denial of reimbursement was based *solely* on the fact that Student was placed at Moonridge for non-educational reasons, which rendered the placement "improper" for purposes of IDEA reimbursement. Therefore, Plaintiffs' arguments that the ALJ ignored evidence of Student's academic progress fail to address the pertinent issue.

Just because Student progressed academically and otherwise thrived in the Moonridge program does not change the purpose for which she was placed there: for social, emotional, and behavioral issues separate and apart from her educational needs.

After reviewing the record, the parties' briefing, and the ALJ's Decision—and after giving the ALJ's findings due weight—this Court finds that the preponderance of the evidence supports the ALJ's finding. This Court affirms the ALJ's finding Student was placed at Moonridge for social, emotional, and behavioral reasons separate and apart from educational needs. Plaintiffs have therefore failed to meet the second prong of the reimbursement test. This Court affirms the ALJ's denial of reimbursement.

## IV. CONCLUSION

This Court affirms the ALJ's decision that Plaintiffs were not entitled to reimbursement for tuition and related expenses at Moonridge.

Accordingly,

**IT IS ORDERED affirming** the February 22, 2020 decision of the Administrative Law Judge (Doc. 1-2).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly and terminate this case.

Dated this 31st day of January, 2022.

Honorable Steven P. Logan
United States District Judge